The first case this morning is 522-0429, People v. Wisdom. Arguing for the appellant is Eunsoon Nam. Arguing for the appellee is David Friedland. Each side will have 10 minutes for their argument. The appellant will also have five minutes for rebuttal. Please note only the clerk of the court is permitted to record these proceedings today. Good morning. Good morning. All right. If we are prepared to begin, counselor, you may do so. May it please the court. Counsel, Eunsoon Nam on behalf of Colton Wisdom. There are three arguments on appeal. The focus today will be on the third argument and the first argument in that order. So turning to the third argument, during the preliminary Krinkle inquiry, Colton demonstrated that defense counsel possibly neglected his case where she decided against seeking or obtaining a medical expert for Colton due to her mistaken belief that she would be required to turn over any unfavorable reports to the state and that such a result would backfire on Colton at trial. Considering that her decision was due to a mistake of law or fact, we ask this court to remand Colton's case for the appointment of new independent counsel and for a full hearing on his ineffective assistance claims with new counsel. A court's determination that a defendant's claim does not, a pro se defendant's claim does not demonstrate possible neglect of the case will be reversed where the decision is manifestly erroneous and manifest error is error that's clearly evident, plain, and indisputable. And that's what we have here. Specifically in Colton's case at the preliminary inquiry, defense counsel admitted that she talked about getting a medical expert at different times with Colton, but how, however, she did not ultimately get a medical expert in part because she believed that if she attempted to obtain a medical expert for Colton, it may have not gone favorably and that if it did not go favorably for him, then she would have to disclose this unfavorable report to the state. And she thought that any unfavorable report could have backfired on him at trial. And her reasoning can be seen in the trial court's order denying Colton's claims and denying his request for independent counsel. The court cited to counsel's mistake of law or fact and that her decision was in part due to her concerns that having another medical expert review the medical information could result in another medical expert testifying against her client rather than in her client's favor. The Krinkle procedure is well established. It effectively promotes consideration of pro se claims of ineffective assistance first in the trial court while memories are still fresh in the minds of the participants, the judges, prosecutors, defense attorneys, and the defendants. And it allows for a full trial record on the ineffectiveness claims before direct appellate review to limit or narrow the issues on appeal and to allow the defendants to have the assistance of appellate counsel. A trial court conducting the preliminary inquiry must review the allegations and determine whether his claims reveal possible neglect by defense counsel. If the defendant shows possible neglect, the court must appoint independent counsel to represent him on his ineffective assistance claims at an adversarial proceeding to determine whether counsel was in fact ineffective. And at that point, the state can weigh in. The record should be fully developed and ready for a meaningful appellate review. Notably, a defendant does not need to demonstrate actual ineffective assistance at the initial inquiry. All he has to show is neglect. And that's the problem here. Legally, pursuant to Illinois Supreme Court Rule 412, Rule 413, and People v. Spicer, defense counsel would not have been required to disclose an unfavorable report. And the state admits as much. On page 49 and 50 of the state's brief, it states that defense counsel had no obligation to disclose unfavorable reports or opinions of testifying experts to the state pursuant to Supreme Court rules. And Colton's claim that defense counsel failed to obtain a medical expert on his behalf was not meritless, and it could not have been dismissed purely as a strategic decision because it was grounded on counsel's mistake of law or fact. The state recognizes that Colton's ineffective assistance of counsel claims related to the need for a medical expert would require further support with extrinsic evidence. But then it asked this court to delay justice by arguing that this is more appropriate for a post-conviction petition. But this is the type of matter that's exactly what a crinkled inquiry and further crinkled proceedings were designed for, to be able to flush the matters out while all the parties remember the trial, remember the case when everyone is together. And especially the harm here is the subject matter. So here we're dealing with shaken baby syndrome or abusive head trauma. It's a medical diagnosis or hypothesis that's highly controversial and scrutinized by the medical field. There is a clear divide between the experts. But there's no debate in Colton's case that his trial was heavily based on medical evidence. We have three separate doctors, an ER nurse, an EMT. AW's grandmother is a certified nursing practitioner. AW's mother is a certified nursing assistant. This was heavily a medically involved case. And this case should have been a where the case so that the case was evenly balanced. But it wasn't because of the mistaken belief by defense counsel. Rather, it was Colton on his own trying to defend himself against all of the state's medical experts. The state never actually argued, though, that this was shaken baby syndrome. They said that at preliminary hearing. But at trial, they were just saying aggravated battery. All they had to show was abuse, not necessarily shaken baby syndrome. So would an expert even have been necessary then? Yes, your honor. Dr. Rivsteck, he talks about abusive head trauma, and that is the equivalent or the same thing as the shaken baby syndrome. So maybe the terms have changed, but the content doesn't change. So we still have the triad. We have the retinal hemorrhaging. We have the brain swelling. We have the breathing issues. We have all of the factors. So shaken baby syndrome and abusive head trauma is the same thing, just different terms. And so when the doctors are talking about the triad of symptoms, the fact that there's retinal hemorrhaging, that goes to the issue of shaken baby syndrome or, again, abusive head trauma. So we have all of the doctors testify. Maybe they don't, maybe not all of the doctors like McCool, Napa, maybe they don't talk directly or state this is a shaken baby syndrome case. But everyone and defense counsel knew from the get-go that this was a shaken baby syndrome or abusive head trauma case. There's no doubt about that. It was in the preliminary hearing, as your honor stated. Dr. Rivsteck is a child abuse expert doctor that talks about the studies, the symptoms, the fact that AW met four or five out of the tests that he talked about in the studies. So there is no doubt that this is a shaken baby syndrome case, even if they don't specifically state shaken baby syndrome to the jury. But wasn't there evidence of a large shaken baby? The state charged it, your honor, yes, the state charged it as either throwing or shaking. Dr. Rivsteck talks about shaking must be a component in these types of cases. And as this court knows, Dr. McCool did testify that maybe the fresh hematoma in the back of AW's could have been indicative of a dog pushing the baby. So we have those types of testimony. And here we have no defense expert. And as your honors know, defense counsel admitted to the jury during cross-examination that this was hard, this was difficult. She doesn't really understand the concept or the idea of all of these medical diagnoses, terms, symptoms. She tells that to the jury in front of the jury during one of the doctors, I think it was Dr. Rivsteck's cross-examination. So counsel admits that. Plus we have counsel admitting on the record that her decision not to even get an expert or look for one was because of this mistaken law that she might have to turn this over to the state, which was not the case at all. That was not the case. We have cases from years and years ago saying that that's not the case, but that's what happened in this case. Let me stop you and ask you to very, very briefly, you have 40 seconds left right now. Just touch on the first issue with regard to A.W. being allowed to roam around in the courtroom. Yes, your honor. As this court knows, A.W.'s father carried her into the courtroom. The judge recognized that maybe she wanted to be let go. The dad lets her go in the courtroom. She roams around the courtroom, interacts with the witness on the stand, which is her grandmother, then goes into the jury box, interacts with the jurors in the first row, then interacts with the jury on the second. The jurors are selected in the second row. Is she actually in the jury box? Yes, your honor. That's what the record demonstrates. I will come back and rebuttal. I'd like you to just answer if anybody has any questions on this particular issue so that your opponent has an opportunity to address anything you may say right now. I may be wrong. My recollection was in your brief. I thought I read that it was at one point stated she was roaming around interacting with the jurors in the jury box. Then in another spot, I thought it said she was in front of the jury box interacting with the jurors. I was just trying to be clear. Was she up on people's laps? Was she up there physically touching people? Or was she in front of the box saying hello to everyone? It's definitely that she was in front of the jury box because she was in the courtroom in general. There's also from defense counsel's motion, defense counsel stated that the child actually entered the jury box, interacted with the jurors in the first row, and interacted with the jurors in the second row. I don't know if she was in their lap or talking directly to the jurors. Again, we have her talking to her grandmother. We have her saying hi. We have her, according to defense counsel, in the jury box in the front and second row of the jury. How old is she at that time? I believe she was three or four at that time. Okay. I'm sorry. My understanding is just Judge Hartridge tried to rectify that. My understanding from the briefs was that he saw that was occurring and directed the father to go pick her up and stop that very quickly. To me, if she's in the as she's approaching the first row, slowly would be if she's been through the first row and now she's in the second row, that wasn't very quick to have her removed from their presence. How quickly can you determine for me or direct me to how quickly he addressed that issue? Unfortunately, I can't. All we have is the judge's statement after the fact. Defense counsel asked the judge to make a record. Judge says, I can find the quote on rebuttal. I know the quote, but yeah. Okay. The judge sees the child in the box, tells the dad to remove. The state doesn't do this. The state, as your honors know, has the ability to control their witnesses and their exhibits. That doesn't happen here. It's actually the judge that tells the dad to take the child out. That's the extent. Again, we have defense counsel's post-trial motion where she signs it. She's certifying that she's a representative of the court. That's what we have in this case. Okay. Follow-up question to that. Obviously, you're saying that that was error and prejudicial. I suppose the question is, what was the timing of the prejudice? Was the timing of the prejudice the child being in the courtroom at all? Was the timing of the prejudice her going into the jury box if she did? What's the timing of the prejudice? Our argument is that all of this is prejudicial because none of this was required. We have photos. We have medical reports. We have the mom and the grandma testifying about her. She's the cornerstone of the state's case. She's the person that was hurt. We have all of that. Even at the very least, if the dad just brought her in and took her out after the identification, which was the main purpose that the state cited as to her being in the courtroom, if the dad just brought her in and took her out, maybe that would have minimized it. Here, we have her in the courtroom interacting with the witness and in the jury box. That's all prejudicial is our argument, Your Honors. Okay. Justice Vaughn, do you have any questions? No. No questions. Thank you. Okay. You'll have time to rebuttal. Thank you. Counselor? Good morning, Your Honors. David Friedland on behalf of the people. Good morning, counsel. May it please the court. I'll address issue one to begin. Your Honors indicated that you have the quote from page 508 of the record of what happened. Counsel just said that defense motion as an officer of the court can be considered here. I disagree with that. The record is what the record is on page 508, and the court gave a summary of what happened. Defense counsel asked the court to say what happened with respect to A.W. and the child. The court did. The defense counsel expressly agreed that the court's summary was an accurate summary. Counsel could have added whatever it wanted, could have said that the A.W. was on lapse, made it into the jury box. Didn't. We are stuck. What Your Honors should consider is what the court said and what the defense agreed to. That's on page 506, 507, 508 of the record that the child came in, walked around, walked towards the jury box, walked around the jury box. What around the jury box means, we can't say, did he go in? Did it not go in? But the court also addressed that it tried to, the defense didn't ask for a limiting instruction. The defense didn't ask for a mistrial at that point. So coming back now and saying that this is somehow colored and was overly prejudicial to this trial or to the defendant's rights simply is without merit. And if there was error there, I mean this, if ever there was a case of harmless error beyond a reasonable doubt applied, it is this case. Counsel just said, this is cumulative. The girl at the time that she brought in was able to walk, was able to talk. And I don't know how that could be more prejudicial than the photos, which I urge Your Honors to review. Those were introduced with her entire skull sutured back onto her head, laying in a medically induced coma, bruises all over her face, body, each one individually photographed. How is the brief presentation of this, of AW coming into the jury box? She says it's cumulative. If it's cumulative, how is it more prejudicial? The brief argues about that there was, that we're stipulating to the injuries. Well, if we're stipulating to the injuries and that there's, and it didn't at the time, as my brief points out, they didn't stipulate that great bodily harm was alleged. Certainly they are indicating now that there's no issue as to whether the child suffered any great bodily harm. But the fact that that's not an issue in the case, that the issue is whether or not he did it or the dog did it, minimizes any prejudice to the defendant. And therefore it's harmless beyond a reasonable doubt. Again, yes, there are all the photos. Was this necessary? Potentially, potentially not. The state's entitled to present its case as it wanted. Presumably the child shows some evidence of great bodily harm that the state wanted to show that couldn't have possibly been caused by this dog. So that's how the state chose to proceed. Correct me if I'm wrong, though. The defense did object initially to having the child in the courtroom and the court overruled that objection, correct? Correct, yes. That occurred. They didn't move, but the second part of that is they didn't move for a mistrial. They didn't ask for a limiting instruction and they conceded. So yes, the child was brought in, and defense counsel in the brief, I think what they're relying on is Barnes and Barnes was the reversal. I don't think this is a Barnes case. In Barnes, clearly the child was pulling down a child's pants in front of the jury. A young child to show scars was meant for shock value. And further, in Barnes, as I've pointed out, Barnes was reversed not only for the shock value or the inappropriate presentation of the child victim, but also because it was implied that the defendant had committed another act of violence against that child and was responsible for a liver contusion. There were two reasons for the reversal, and the court expressly said the presentation of the victim's scars and the improper other crimes evidence about the liver contusion were merited the reversal, which made sense in that case because the issue was whether or not he intended to inflict that injury. If he had inflicted injury on another occasion, i.e. this liver contusion and injured the child, it was more likely that the scarring from the bath wasn't an accident. We don't have that here. That's not an issue here. The only issue for the jury to decide here is whether he caused that abuse of that trauma to her head on February 6th or whether she was knocked over by the dog. I mean, this is the oldest excuse in the book. Your honors know that. The dog did it. The dog ate my homework. The dog knocked her over and caused the bruise on the back of her head. Whether we're in closely balanced or plain error, we're in harmless beyond a reasonable doubt, or as I get to in a crankle inquiry or an effective assistance of counsel, a prejudice argument, there's no prejudice here because the defendant did it. He committed the crime. There's no question that the evidence establishes that he committed this crime. The dog did it. Let me stop you for one second. You brought up the point that we're looking at the injury from February 6th. There was a lot of injuries to this young child that my reading of all the medical testimony was that they can't really determine that a lot of it was done on February 6th.  The injury that caused or the accident or the incident that caused her injuries on February 6th was the trauma to the back of the head. You can correct me if I'm misinterpreting that or misunderstanding that, but if that is the sole condition that caused her great trauma, how much do we rely on the fact that she had all those other injuries that were extensive? But I don't know that those were necessarily proven to be who caused those. I mean, there's great speculation, of course, but how do we get to contribute any of those other or should we even contribute any of those other injuries to the result that occurred on February 6th? To be candid, I can't believe that there would be speculation as to who caused those injuries. You can see the text message. This child moved in with the defendant in A.W. in November of 19, and less than three months later, February 6th, the child is in a medically induced coma with a permanent life-altering injury. You can see from the text messages the timeline of the injuries, and you've heard defendant's explanation for where those injuries came from. You begin with January 3rd. He sends a text message to her that says, I just had to beat your child. I apologize. She was screaming, no, no, no, because she didn't want to bath. Then we move forward. She was, I whipped her pretty hard on the third. I don't think she'll do it again. That's his text. January 4th, they're having a conversation, and it's clear he was frustrated with being home 24 7 with her, and he was potty training her, which everybody can relate is a very frustrating time, especially if it's not a child that's yours and you're not working. You can see what happened here. After he says, I whipped her pretty good. He's upset about it. He's exchanging texts, says to Jasmine, the mom, yeah, but you don't beat her, and I'm still at the gym. So clear that he did beat her on the leading up to the 16th. Then you get to the day, the real day of when you start seeing the escalation is January 16th. You may, I'm sorry, January 15th. You may have a dead kid. I may have to kill your child. On the 16th, there's the potty training. No, I'm going to beat her ass. She's not using the potty on purpose. You have to get her out of the gym. He tells the mom, my temper is going to get the best of me. So it's probably best if you get Dylan to watch her or something like that. And then he's, I mean, the text messages speak for themselves. There's an ongoing escalating pattern of abuse and culminating. She's got the goose eggs. So your honor, I don't recount the text messages. No, I understand the question, the question of whether, and I see what your honor is getting at. The question is whether that injury to the back of the head could have been caused by the dog. And therefore, you know, she had all these other things. Was that one day the dog and therefore is he responsible for the great bodily harm that resulted on that day? You have to, your honor, you just have to disbelieve his ludicrous statement that the dog did it. There's two hematomas there. There's one in the back of his head, back of her head. And there's one on the front of the head. And the medical experts is that the injury and the brain bleed occurred on February 6th. And four medical people all say this isn't accidental abuse. And that if you look at the picture of the dog, which is in people's, I think exhibit page 42, it's a tiny dog. There's no way that that one, that one that happened, you know, that he didn't happen. He says, Jesus, I didn't want to, I don't want to go to prison on the 16th. He's conscious that this, he's doing this. So we can just, we can discount the dog entirely. But even if your honor is, and the medical reports are that the injury on February 6th related to all the trauma and everything else, if it was all related to prior instances or of abuse that he inflicted on her, and then just even a small head or injury that day resulted in this neurological injury, he's still guilty because that's the triggering event. And I just want to briefly touch on counsels that leads me to the Krankel inquiry and the ineffective assistance. First, the ineffective assistance claim that has to be a post-conviction. You can't establish straight post-conviction prejudice without the actual report showing that somebody was going to come in and testify to this nonsense that a dog or a small fall backward in one hematoma could have resulted in these injuries. That person doesn't exist. And I think the, the Jasmine knows that she said, I'm doing this because I love my child. She doesn't believe him. The jury didn't believe him. The trial judge looked at the merits of his Krankel inquiry after Romaine and said, I don't believe this. That expert's not out there. And yes, defense counsel made a mistake of law that that negative report. If I may briefly finish, I'm wrap up. All right. Defense counsel made a mistake of law. That's clear. That doesn't, but the court correctly said it can look at the merits of the claim. The court doesn't believe this defendant either. This claim is nonsense. It is ludicrous. And in this case, the defendant said, it simply doesn't need further Romaine for further examination into a hypothetical expert that exists. The SBS and the HD are not at issue. This is not Petrie. There is no question about the triggering event who caused it or when, and there's no sense for Romaine in this case for further proceedings. With that judge, we ask you to affirm the convictions and sentence. And unless there's any questions, I thank you for your time. Thank you. Yes, your honor. Um, so we asked this court to use common sense when there's 18 photos, when there's, uh, three doctors, a nurse, a, an EMT, and then the family members all testifying to AWS, um, injuries, how she's doing now. The only reason for the, the state to ask her to come in for identification purposes is to inflame the passions of the jury and into illicit sympathy. And in here we have, um, and as, uh, counsel stated, but. The defense attorney in the post-trial motion states that, um, AW went into the jury box, the first and second row. The state doesn't deny this later. The court doesn't correct the attorney. The attorney, um, filed the motion. There was no, no, uh, no claim that she was lying or that counsel was misstating, uh, misstating what happened. And that's what, that's what we have here. She says that the child went into the jury box, the first and second rows. Um, and again, as the state state stated, there's no reason for AW to really come into the courtroom. And if anything, the state should have controlled their exhibits, uh, the live exhibit, and then the grandma, but the grandma asked for kisses. We have AW saying, hi Grammy, hi to people in the courtroom. We have her in the jury box. So we have all of these things that are beyond Barnes. So in Barnes, we have, uh, the state's attorney showing the jury, uh, the scars, but here it's not, it's not the jury just seeing AW from afar. If, if the jury just saw AW from afar, when the would be okay, maybe, but here we actually have her in the courtroom. We have her, you know, walking around, we have her interacting. We have her going into the jury box. This is different than Barnes. This is not just a brief moment in time where, um, the, the prosecutor shows the jury, the, the child, and then the child leaves. This is, this is beyond that. And again, we have the attorney, uh, objecting pretrial and then post-trial with the, the attorney and Colton did everything that he had to do to preserve this issue. Um, further, this court should also note that the jury during deliberations asked what the, what actual intent or asked what intent actually meant. So it's not, of course, it's not completely indicative, but we have the jury questioning intent. And the issue in this case was whether it was accidental or intentional. So the jury was at least contemplating the meaning of intent in this case. So it's not a clear-cut case, especially as, as we argue in the, in the briefs, defense counsel didn't, um, even try to get an expert. And we have her admitting to the jury, this is hard. This is difficult. I'm not quite sure about this. I'm not quite sure about, um, the, the medical aspect of it. All of this is difficult. So we have that. We have an attorney who didn't because of a mistake of law or fact, and, um, the state admits it because of a mistake, she doesn't even attempt to get an expert. She could have consulted with the expert. She could have, um, brought in the, brought in the, um, the fact, or at least told the jury that there is a clear divide, that there is, um, there are experts out there who question this, this diagnosis, this type of triad of symptoms. There, there's a, there's a clear divide in the medical community, and she doesn't bring any of this to light. She doesn't even attempt to talk to an expert or even find one for, um, find one for Colton. Um, and as the, as the record shows, Jasmine believed Colton, um, when he told her that some of the, some of the bruises were due to her falling or maybe tripping. They talked about how she was, uh, an active child. And again, we do have the text messages, those, those exist, but, um, Colton, Colton babysat her, um, a lot, and nothing like this happened before. And we do have Dr. Kuhl on the record saying the back of the head hematoma, the freshest one, that one could have been from a fall, um, maybe when the dog pushed her. So it's not, it's not clear. There were no witnesses to the event. There were no recordings. There were no video. I want to stop you for just a second because something you just said is confusing to me and a little bit troubling. You said that Colton babysat her a lot and none of this happened before. It seems like the testimony was at about the time Colton started doing the babysitting is when all these bruises started appearing. So how do you justify what you just said to what I thought I read? That's true, your honor. So the bruising did happen and Jasmine testified that she believed that Colton was neglectful, maybe that she, he wasn't watching her carefully, that he needed to watch her better. So we have that testimony, but this is the one in a relation. I'm going to give you time. I don't, uh, I know I keep interrupting you. So I will give you a little time to finish your thought, but while it's fresh in my mind and I don't lose it, this is a woman who's in a relationship with him, not trying to, you know, and not perhaps at that point, not convinced. It seems like she wasn't totally convinced that he had done anything until the medical experts told her, this is, this is intent, intentional injuries to this child. Um, that's when she finally quit talking to him. Um, so she's under the belief that, you know, yeah, he's maybe neglectful. He's not a very good dad at this point, a stepdad, whatever, but a babysitter, but the fact still remains. You've got all this damning testimony, regardless of her, uh, way of, of saying, well, you know, he, he, he has a strange sense of humor. He, he exaggerates, he's joking. He's got a twisted, you know, sense of humor when he's saying, you know, that I'm going to have to kill your child. I beat your child. She's still trying to deflect and say, well, maybe that's not really what he did or what he really meant. But when you see all of the bruising, all of the injuries, she may have had blinders on, but it's the jury's determination from a non-emotional standpoint to determine who made, you know, who's responsible for that. How do we get around all of the damning evidence from the texts, from the medical testimony and, and believe that this was a little bitty puppy who never, no one else ever saw this dog jump on anyone. Uh, and I'm not saying that it couldn't have happened that the child was knocked over by the puppy, but the pup, the, my understanding of the medical testimony was the retinal bleeding and the extent of it would not have been caused by the bump on the back of the head, that one bump on the back of the head. Yes, your honor. And talking about the retinal bleeding, we have testimony in this case that AW had vision problems, that there were issues with her vision before Colton even came into the picture. So we have that in our medical history. We have medical history from her that she may have had seizures. Are those visual issues though caused by, I mean, is there testimony that I missed that said that the visual problem she was having was due to retinal bleeding? We don't know, your honor, because the, Jasmine was supposed to take her for the eye exam and we don't have any testimony regarding that. And I don't know if she took her prior to, well, it doesn't seem like she took her prior to Colton entering the picture, but the vision problems existed before Colton entered the picture. So we don't know exactly what they were, but that was before we have the seizure problems before Colton comes into the picture. And again, even as your, as your honor stated, even with the text messages with all of the doctors, and again, in our case, we only have Colton self-defending. We don't have any medical expert from his point or his side. But we still have the jury asking the question about intent. So even if one juror or half the jury or whoever, if they had any question about intent, and this was, this was the issue, right? The issue was how, or how did AWS come to suffer from all of this head trauma or who, or who caused the injuries to AWS? So when the issue is how and who, and there's a, there's a question of intent, at least there was some question of, of that in the jury. And again, going to the first issue, the jurors interacted with AWS. So considering the, the prejudice there, the inflaming of the passions, the sympathy that's aroused by interacting with the child who was, who, who had all this head trauma and was recovering from it or trying to recover from it, that by itself was prejudicial. And on top of that, we still have the jury questioning this issue of intent. And, and one last point, your honors, the, in one of the cases, I believe it's state versus needs. It's a New Jersey case. We have defense experts that testify for the defense in cases. So we, it's not that defense experts aren't out there. It's that council didn't even try to acquire one. So that's, that's the problem here, your honors. Unless there's any other questions. Justice Schouler, Justice Vaughn, any questions? No questions. Okay. All right. Well, thank you both for your, for your briefs and your arguments. I found them both to be very informative. We will take the in due course.